[No. 75240-1. En Banc .]
Argued February 17, 2005. Decided August 18, 2005.

VIKING PROPERTIES, INC., *Respondent*, v. OSCAR WILLIAM HOLM, JR., ET AL., Appellants.

*James L. Arnett*; *Jeanne M.* and *Mark E. Basel*; *Christina L.* and *James J. Birchman*; *Richard N. Davies*; *Aldene C. Dunn*; *Martha J.* and *Oscar W. Holm*; *Bronston S. Kenney III*; *Dorothy* and *James E. McManigal*; *Ann M. O'Connor*; *Maureen J. O'Neill* and *Robert R. Otto*; and *Kristin L.* and *Robert E. Shelley*, pro se.

*Chryssa V. Deliganis* and *Steve P. Calandrillo*, for appellants.

*Richard L. Settle* and *Patrick J. Schneider* (of *Foster Pepper & Shefelman, P.L.L.C.*), for respondent.

*David S. Mann* on behalf of 1000 Friends of Washington, amicus curiae.

*William B. Stoebuck*, amicus curiae.

¶1 J.M. JOHNSON, J. — Appellant homeowners (Homeowners) and respondent Viking Properties, Inc. (Viking), own residential properties in a subdivision in the city of Shoreline (City) subject to a decades-old restrictive covenant. The covenant bars racial minorities from ownership of the land and imposes a density limitation providing that there may be no more than one dwelling on each one-half acre. Viking asked Homeowners to release the entire covenant so Viking could redevelop a lot it purchased in 2002. After Homeowners refused this demand, Viking

filed a declaratory judgment action to invalidate the covenant.

¶2 On summary judgment, the trial court invalidated the entire covenant on the following grounds: (1) the racial restriction was unenforceable and not severable from the remainder of the covenant; (2) the density limitation violated public policy as set forth in the Growth Management Act (GMA), chapter 36.70A RCW, the City's comprehensive plan, and the City's zoning regulations; and (3) judicial enforcement of the covenant would violate Viking's substantive due process rights. We reverse and remand, severing the racial provision and upholding the density limitation as enforceable.

## I. FACTS AND PROCEDURAL HISTORY

¶3 The parties to this suit all own property derived in title from a common grantor. In 1932, the grantor acquired a block of property located in the Richmond Beach neighborhood of what is now the city of Shoreline and subdivided the block into lots. Between 1937 and 1941, the grantor sold each lot within the subdivision subject to an identical restrictive covenant. The covenant contains four sentences and states:

> This property shall not at any time, directly or indirectly, be sold, conveyed, rented or leased in whole or in part, to any person or persons not of the White or Caucasian race. [2.] No person other than one of the White or Caucasian race shall be permitted to occupy any portion of any residence tract or of any building thereon, except a domestic servant actually employed by a White occupant of such tract and/or building. [3.] No building or structure shall be erected, constructed, maintained or permitted upon this property except a single family, detached private dwelling house on each one-half acre in area. [4.] As appurtenant to such dwelling house a private garage, garden house, pergola, convervatory [sic], servant quarters or other private appurtenant outbuildings or structures, may be erected, constructed and maintained.

Clerk's Papers (CP) at 44.

¶4 All parties agree that the racial restrictions contained in the first two sentences are unenforceable and void under *Shelley v. Kraemer*, 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161 (1948), and RCW 49.60.224, *enacted by Laws of* 1969, 1st Ex. Sess., ch. 167, § 6.[1] However, the Homeowners claim that they purchased and developed their properties in reliance on the continued validity and enforceability of the density limitation contained in the last two sentences of the covenant, which has been continuously observed.

¶5 Today, the subdivision contains 13 lots, each of which is at least one-half acre[2] in size and contains only one single-family dwelling. Under the City's zoning regulations, the subdivision has a prescribed minimum density of four dwelling units per acre. *See* Shoreline Municipal Code (SMC) Table 20.50.020(1). Up to eight dwelling units per acre are allowed under the City's "cottage housing" regulations. *See* SMC 20.40.120, .300(C).

¶6 In July 2002, Viking bought a 1.46 acre lot located within the subdivision. Viking admits that it was aware of the terms of the covenant prior to purchase. Three months after the purchase, Viking's president sent a letter to each of the Homeowners asking them to execute a total release of the covenant and informing them that they would be sued if they refused. All Homeowners declined Viking's request.

¶7 Viking thereafter filed a declaratory judgment action in King County Superior Court, seeking an order quieting title and declaring the covenant unenforceable in its en-

---

[1] RCW 49.60.224 provides in pertinent part:

(1) Every provision in a written instrument relating to real property which purports to forbid or restrict the conveyance, encumbrance, occupancy, or lease thereof to individuals of a specified race . . . , and every condition, restriction, or prohibition, including a right of entry or possibility of reverter, which directly or indirectly limits the use or occupancy of real property on the basis of race . . . is void.

(2) It is an unfair practice to insert in a written instrument relating to real property a provision that is void under this section or to honor or attempt to honor such a provision in the chain of title.

[2] Although all lots originally exceeded one-half acre, one of the 13 lots was reduced to 0.492 acres after a small portion was condemned to widen Richmond Beach Road. The resulting deviation from the covenant's terms does not affect enforceability.

tirety.[3] After discovery, Viking moved for partial summary judgment. Viking argued, inter alia, that (1) the covenant's racial restriction is invalid and cannot be severed from its density limitation; (2) public policy favoring higher densities as set forth in the GMA, the City's comprehensive plan, and the City's zoning regulations conflict with the density limitation, thereby rendering it unenforceable; and (3) judicial enforcement of the covenant would violate Viking's substantive due process rights because Viking could not comply with both the covenant and the applicable zoning regulations. The trial court agreed with Viking, holding that the covenant was unenforceable on each of the above grounds, and entered summary judgment in Viking's favor.

¶8 The Homeowners moved for reconsideration, arguing that the court had wrongfully placed the burden of summary judgment on the nonmoving party. The Homeowners also submitted a declaration from the planning manager for the City, stating that she had consulted with the city attorney and had concluded that the City:

> would process building permits on a lot with area that exceeded the minimum densities under the code for the land use district as a nonconforming lot. A plat application creating lots larger than the minimum density for the land use district would be approved so long as the lot configurations proposed allowed for further subdivision to the Development Code minimum density in the future. This has the same effect as a provision allowing gradual but not immediate conformity with the development standards for nonconforming uses.

CP at 310-11. The City's conclusion would allow for two dwellings to be located on Viking's lot.

¶9 The court denied the motion for reconsideration and entered a final order incorporating the court's rulings on

---

[3] In its amended complaint, Viking alleged multiple causes of action, claiming that the covenant was invalid and unenforceable due to (1) abandonment, acquiescence and estoppel; (2) frustration of purpose, change of conditions and character of neighborhood, and violation of public policy; (3) violation of equal protection; (4) violation of prohibition of special privileges and immunities; and (5) denial of due process.

summary judgment and reconsideration. The Homeowners then appealed directly to this court.

## II. Standard of Review

¶10 "This court reviews the facts and law with respect to summary judgment de novo." *Schaaf v. Highfield*, 127 Wn.2d 17, 21, 896 P.2d 665 (1995). "In reviewing the evidence, the trial court must consider the evidence and the reasonable inferences therefrom in a light most favorable to the nonmoving party." *Id*. Summary judgment is appropriate only when, after reviewing all facts and reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *see also Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

## III. Analysis

 ¶11 Restrictive covenants are enforceable promises relating to the use of land. *See generally Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 690-91, 974 P.2d 836 (1999); 17 William B. Stoebuck & John W. Weaver, Washington Practice: Real Estate: Property Law § 3.1, at 123 (2d ed. 2004). A covenant that governs a general building scheme designed to make the property attractive for residential purposes is enforceable unless it clearly violates an overriding public policy. *See Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 815, 854 P.2d 1072 (1993).

### A. Severability of Racial Restriction

¶12 Viking initially claims that the unenforceable racial restriction contained in the first two sentences of the covenant cannot be severed from the remainder, thereby rendering the covenant void in its entirety. It makes several arguments in support of this proposition. Our jurisprudence requires rejection of each.

### 1. *Background*

¶13 A court's first objective in interpreting a restrictive covenant is ascertaining the intent of the original parties. *Riss v. Angel,* 131 Wn.2d 612, 621, 934 P.2d 669 (1997). Where enforceability is challenged, "Washington courts have . . . held that restrictive covenants, being in derogation of the common law right to use land for all lawful purposes, will not be extended to any use not clearly expressed, and doubts must be resolved in favor of the free use of land." *Id.*; *see also Burton v. Douglas County,* 65 Wn.2d 619, 622, 399 P.2d 68 (1965); *Jones v. Williams,* 56 Wash. 588, 591, 106 P. 166 (1910).

¶14 More recently, however, we have indicated that "where construction of restrictive covenants is necessitated by a dispute not involving the maker of the covenants, but rather among homeowners in a subdivision governed by the restrictive covenants, rules of strict construction against the grantor or in favor of the free use of land are inapplicable." *Riss,* 131 Wn.2d at 623. This is because " '[s]ubdivision covenants tend to enhance, not inhibit, the efficient use of land . . . . In the subdivision context, the premise [that covenants prevent land from moving to its most efficient use] generally is not valid.' " *Id.* at 622 (emphasis omitted) (second alteration in original) (quoting *Mains Farm,* 121 Wn.2d at 816).

¶15 As such, "[t]he court's goal is to ascertain and give effect to those purposes intended by the covenants." *Riss,* 131 Wn.2d at 623. In ascertaining this intent, we give a covenant's language its ordinary and common use and will not read a covenant so as to defeat its plain and obvious meaning. *Mains Farm,* 121 Wn.2d at 815-16. Moreover, "[t]he court will place 'special emphasis on arriving at an interpretation that protects the homeowners' collective interests.' " *Riss,* 131 Wn.2d at 623-24 (quoting *Lakes at Mercer Island Homeowners Ass'n v. Witrak,* 61 Wn. App. 177, 181, 810 P.2d 27 (1991)).

## 2. *The Invalid Racial Restriction is Severable and the Density Limitation Enforceable*

¶16 Here, the parties are all successors in interest. Thus, the rule of liberal interpretation should apply to protect all the property owners' interests. Viking disagrees, however, arguing that covenants should be construed liberally only when the covenant's purposes are in harmony with modern land use regulation. This argument fails for two reasons.

¶17 First, the only authority Viking cites in support of this contention is a law review article authored by University of Washington Professor William Stoebuck. Br. of Resp't at 13 (citing William B. Stoebuck, *Running Covenants: An Analytical Primer*, 52 WASH. L. REV. 861, 885-86, 904-05 (1977)). However, the cited article does not support Viking's argument, but rather undermines it. *See* Stoebuck, *supra*, at 886 (stating that "the judicial tendency for some time has been toward favoring the existence of covenants. While covenants may theoretically encumber titles, as usually employed today they make land more marketable and improve its value.").[4] Moreover, Professor Stoebuck categorically rejects Viking's characterization of his writings (and its conclusions) in an amicus curiae brief submitted in this case. *See* Amicus Br. of Stoebuck at 5-6, 9-11.

¶18 Second, Viking's contention fails to find support in our most recent jurisprudence addressing the construction of restrictive covenants. In particular, *Mains Farm* rebuts Viking's argument. In that case, a group of homeowners subject to a restrictive covenant sought an injunction to prevent another homeowner from operating an adult family home business. 121 Wn.2d at 813-14. The covenant at issue provided that " '[a]ll lots or tracts in MAINS FARM shall be designated as "Residence Lots," and shall be used for single

---

[4] Viking also suggests that invalidating the covenant will increase the value of the Homeowners' properties. However, a party to a covenant is entitled to seek its enforcement even if the threatened breach does not negatively impact the value of his property. Moreover, the increase in value that Viking alludes to here would be realized only if the Homeowners sold their properties for subdivision and redevelopment. The value of their homes *as homes* likely would decrease. *Accord* Reply Br. of Kenney at 8.

family residential purposes only[,]' " and that " 'no structure shall be erected, altered or placed on the plat of MAINS FARM which shall serve other than a single family dwelling unit . . . .' " *Id.* (emphasis omitted).

¶19 The trial court issued an injunction enjoining the operation of the adult family home business and we affirmed, even though the legislature had provided by statute that adult family homes were to be considered residential for zoning purposes. *Id.* at 822 (citing RCW 70.128.175(2)). This conclusion contravenes Viking's assertion that covenants are to be construed liberally only when they are in harmony with land use regulations. *See also Riss,* 131 Wn.2d at 622-24, and *Metzner v. Wojdyla,* 125 Wn.2d 445, 450, 886 P.2d 154 (1994) (both concluding that the enforcement of residential restrictive covenants is favored in Washington, notwithstanding land use regulations).

■■ ¶20 Viking next claims the covenant is not severable on the grounds that if only the racial terms are excised, the covenant's meaning is radically distorted—thereby rendering the covenant invalid. This would be true only if we accepted Viking's exceptionally strained construction of the covenant's text.[5] But as explained above, principles of strict construction do not apply here, and we avoid forced or strained constructions that lead to absurd results. *See, e.g., State v. Stannard,* 109 Wn.2d 29, 36, 742 P.2d 1244 (1987); *Eurick v. Pemco Ins. Co.,* 108 Wn.2d 338, 341, 738 P.2d 251 (1987).

¶21 Viking also asserts that because the covenant does not contain a severance clause, the drafter's intentions

---

[5] For example, Viking would have us sever the first sentence of covenant as follows:

This property shall not at any time, directly or indirectly, be sold, conveyed, rented or leased in whole or in part, to any person or persons ~~not of the White or Caucasian race.~~

*See* Br. of Resp't at 17. This excision transforms the sentence into an impermissible complete restraint on alienation. *See McCausland v. Bankers Life Ins. Co. of Neb.,* 110 Wn.2d 716, 722, 757 P.2d 941 (1988) (unreasonable restraints on alienation are invalid). However, this result was not contemplated by the sentence's plain terms; the gravamen of the original sentence was discriminatory animus, not a desire to restrain the alienability of the property generally.

regarding severance cannot be known. However, intent is drawn from the ordinary and common meaning of a covenant's language. *Riss*, 131 Wn.2d at 621 (citing *Metzner*, 125 Wn.2d at 450; *Mains Farm*, 121 Wn.2d at 815). Under this covenant's plain terms, it is clear that it was written with two logically distinct purposes: to exclude racial minorities from ownership or possession of the land, and to limit the number of principal dwellings to no more than one for every one-half acre. Not only are these purposes logically distinct, they are textually separate from each other, with the racial restriction contained in the first two sentences and the density limitation in the latter two. It reasonably follows that the racial restriction is severable from the remainder of the covenant.

¶22 Relevant legislation also supports this conclusion. The legislature did not declare in RCW 49.60.224 that every written instrument containing a racial restriction is void in its entirety. Rather, the legislature said that every *"provision* in a written instrument" relating to real property which purports to forbid or restrict the conveyance or occupancy thereof "is void." RCW 49.60.224(1) (emphasis added). The first two sentences of this covenant constitute such a racial "provision" and thus have long been unenforceable and void. *See also Shelley*, 334 U.S. 1.

¶23 Quite separate from the racial restriction, the last two sentences provide that only one dwelling may be built on each one-half acre of land. Not only is this the logical, commonsense construction of the covenant's language, it is also the construction that best guards " 'the homeowners' collective interests.' " *Riss*, 131 Wn.2d at 624 (quoting *Lakes at Mercer Island Homeowners Ass'n*, 61 Wn. App. at 181). It has been so understood for over 50 years.

¶24 Viking also contends that if any portion of the covenant remains valid, the valid elements impose no limitation on the number of dwellings that can be constructed on its property because the last sentence allows buildings other than the main residence. This contention lacks merit, however, as it disregards the important re-

stricting term "appurtenant." "Appurtenant" has a clear and long-established meaning: "annexed or belonging legally to some more important thing . . . incident to and passing in possession with real estate . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 107 (2002). *See also* BLACK'S LAW DICTIONARY 111 (8th ed. 1999);[6] WEBSTER'S NEW INTERNATIONAL DICTIONARY 134 (2d ed. 1944);[7] BLACK'S LAW DICTIONARY 132 (3d ed. 1933).[8]

¶25 Despite this, Viking claims that nothing in the covenant prevents appurtenant buildings from being constructed and then separately conveyed. This claim fails because, the moment that such appurtenant structures were separately conveyed, they would no longer be "appurtenant" to the principal residence, thereby violating the covenant. *See, e.g., Sandy Point Improvement Co. v. Huber*, 26 Wn. App. 317, 320, 613 P.2d 160 (1980) (stating that structure on one lot could not be "appurtenant" to structure on an adjoining lot).

¶26 We conclude that the trial court erred when it ruled that the unenforceable racial restrictions could not be severed from the remainder. Allowing private property owners to protect their rights by entering into restrictive covenants has long been favored in this state. Pursuant to the plain and ordinary meaning of the instant covenant's text, the racial restriction is severable from the remainder of the covenant and the remainder imposes an enforceable density limitation of one dwelling per one-half acre.

## B. Public Policy and the GMA

¶27 Viking next contends that the density limitation violates public policy as set forth in the GMA, the City's comprehensive plan, and the City's zoning regulations.

[6] Defining "appurtenant" as "annexed to a more important thing."

[7] Defining "appurtenant" as "pertaining or belonging legally" and "annexed or pertaining to some more important thing."

[8] Defining "appurtenant" as "belonging to; accessory or incident to; adjunct, appended, or annexed to . . . . A thing is deemed to be incidental or *appurtenant* to land when it is by right used with the land for its benefit . . . ."

Viking argues that the GMA's "fundamental and over-arching policy" is to concentrate development in urban growth areas. Br. of Resp't at 30 (citing RCW 36.70A.020(1), .110(1)). Because the covenant limits density within such an urban growth area, Viking reasons that the GMA renders the density limitation void or unenforceable. We disagree with this characterization of the GMA and its effects.

### 1. *The GMA Framework*

¶28 The legislature enacted the GMA in 1990 to coordinate the State's future growth via comprehensive land use planning. *See* LAWS OF 1990, 1st Ex. Sess., ch. 17, *codified at* ch. 36.70A RCW. The GMA contains 13 expressly nonprioritized goals that guide local governments in the development of comprehensive plans and development regulations. RCW 36.70A.020. These goals include, inter alia, encouraging development within urban areas, reducing the conversion of undeveloped land into low-density development, retaining open space, protecting the environment, and protecting private property rights. *Id.*

¶29 These goals and their accompanying regulatory provisions create a "framework" that guides local jurisdictions in the development of comprehensive plans and development regulations. RCW 36.70A.3201, *enacted by* LAWS OF 1997, ch. 429, § 2; *see also* 17 STOEBUCK & WEAVER, *supra*, § 4.2, at 171. Within this framework, the legislature has affirmed that there is a "broad range of discretion that may be exercised by counties and cities consistent with the requirements . . . and goals of [the GMA]." RCW 36.70A.3201.

¶30 In other words, the GMA does not prescribe a single approach to growth management. Instead, the legislature specified that "the ultimate burden and responsibility for planning, harmonizing the planning goals of [the GMA], and implementing a county's or city's future rests with that community." RCW 36.70A.3201. Thus, the GMA acts exclusively through local governments and is to be

construed with the requisite flexibility to allow local governments to accommodate local needs.

¶31 Neither the GMA nor the comprehensive plans adopted pursuant thereto directly regulate site-specific land use activities. *See Timberlake Christian Fellowship v. King County*, 114 Wn. App. 174, 182-83, 61 P.3d 332 (2002) (citing *Ass'n of Rural Residents v. Kitsap County*, 141 Wn.2d 185, 188, 4 P.3d 115 (2000); *Citizens for Mount Vernon v. City of Mount Vernon*, 133 Wn.2d 861, 873-74, 947 P.2d 1208 (1997)). Instead, it is local development regulations, including zoning regulations enacted pursuant to a comprehensive plan, which act as a constraint on individual landowners. RCW 36.70A.030(7); *Cougar Mountain Assocs. v. King County*, 111 Wn.2d 742, 757, 765 P.2d 264 (1988).

2. *Legal Challenges Based on Violations of "Public Policy"*

■ ¶32 "The test of whether a contractual provision violates public policy is 'whether the contract as made has a "tendency to evil," to be against the public good, or to be injurious to the public.' " *Thayer v. Thompson*, 36 Wn. App. 794, 796, 677 P.2d 787 (1984) (quoting *Golberg v. Sanglier*, 27 Wn. App. 179, 191, 616 P.2d 1239 (1980), *rev'd on other grounds*, 96 Wn.2d 874, 639 P.2d 1347 (1982)). Before we will find a restrictive covenant to be in conflict with public policy, the record must demonstrate "a legislative intent to declare a general public policy sufficient to override a contractual property right." *Mains Farm*, 121 Wn.2d at 823. A clear demonstration of such intent is especially important in light of the constitutional takings questions that are implicated by the potential violation of such property rights. *Id.*

¶33 In *Mains Farm*, as noted *supra,* we affirmed the issuance of an injunction enjoining the operation of an adult family home on a property restricted by covenant to single-family residential purposes, even though the legislature had provided that adult family homes were to be considered "residential" for zoning purposes. We reasoned in part that

"[w]hen the legislature intends to affect a private land use restriction (i.e., a covenant) as compared to zoning, it does so explicitly . . . ." *Id.* at 823 (emphasis omitted).

### 3. *The Density Limitation Does Not Violate Public Policy*

¶34 The instant case is an appropriate vehicle to illustrate the effect of public policy. In contrast with the racial restriction, it cannot be maintained that the density limitation has a "tendency to evil," nor has the legislature explicitly expressed an intent to override contractual property rights, let alone invalidate those that predate the GMA. The legislature has expressly determined that racial restrictions like that contained in the instant covenant are "void." RCW 49.60.224. The GMA neither states nor implies such an effect with respect to the density limitation.

¶35 Instead, by Viking's own admission, the GMA was intended to coordinate the State's *"future* growth." Br. of Resp't at 30 (emphasis added). In other words, Viking concedes, and we agree, the GMA is primarily prospective in nature, and is premised upon the recognition that influencing future planning decisions is more realistic than changing the decisions of bygone eras. In light of this prospective intent, we cannot endorse Viking's assertion that the GMA, enacted in 1990, overrides a contractual property right executed over 60 years ago.

¶36 Viking's public policy argument also fails to the extent that it implicitly requires us to elevate the singular goal of urban density to the detriment of other equally important GMA goals. To do so would violate the legislature's express statement that the GMA's general goals are nonprioritized. RCW 36.70A.020 ("The following goals are not listed in order of priority . . . ."). We are ever cognizant that this is a legislative prerogative and have prioritized the GMA's goals only under the narrowest of circumstances, where certain goals came into direct and irreconcilable conflict as applied to the facts of a specific case. *See King County v. Cent. Puget Sound Growth Mgmt. Hearings*

*Bd.*, 142 Wn.2d 543, 558, 14 P.3d 133 (2000). We decline Viking's invitation to create an inflexible hierarchy of the GMA goals where such a hierarchy was explicitly rejected by the legislature.

¶37 Indeed, although enforcement of a restrictive covenant may impede some of the GMA's goals, it simultaneously furthers the achievement of others. This observation is not surprising within the context of the GMA, inasmuch as the goals are frequently in tension, if not outright in conflict. *See, e.g.,* 1992 Op. Att'y Gen. No. 23, at 8 (noting that "there is an inherent tension in seeking to accommodate by comprehensive action all of these goals, some of which are in conflict"); 24 HELLER EHRMAN WHITE & MCAULIFFE, WASHINGTON PRACTICE: ENVIRONMENTAL LAW AND PRACTICE § 18.2, at 174 (1997) (describing the general goals as "vague and contradictory").

¶38 Here, it is indisputable that enforcement of the covenant furthers certain GMA goals. For example, because restrictive covenants represent valuable property interests, enforcement furthers the GMA goal of protecting private property rights. *See* RCW 36.70A.020(6) ("Private property shall not be taken for public use without just compensation having been made. The property rights of landowners shall be protected from arbitrary and discriminatory actions."). Likewise, enforcement of the covenant furthers the GMA goal of preserving open space within the Richmond Beach neighborhood of the city of Shoreline. *See* RCW 36.70A.020(9). Notably, Viking fails to consider either of these goals in its brief, and courts will not replace the City's determinations with its own preferences. Balancing the GMA's goals in accordance with local circumstances is precisely the type of decision that the legislature has entrusted to the discretion of local decision-making bodies. RCW 36.70A.3201.

¶39 In addition to its general claims regarding public policy and the GMA, Viking also claims that the growth management hearings boards "have adopted a 'bright line' of a minimum four net dwelling units per acre as defining

urban development." Br. of Resp't at 31 (citing *Bremerton v. Kitsap County, Wash. Cent. Puget Sound Growth Mgmt. Hearings Bd.* [hereinafter CPSGMHB]), No. 95-3-0039, 1995 WL 903165, \*35, 1995 GMHB LEXIS 384 (Oct. 6, 1995). The City's comprehensive plan and zoning regulations also call for a minimum of four houses per acre. *See* SMC 20.50.020. As a result, Viking concludes that the covenant's density limitation "grossly contradict[s]" the provisions of the GMA, the City's comprehensive plan, and the City's zoning regulations and must be declared void. Br. of Resp't at 29. This argument is unpersuasive for several reasons.

¶40 First, Viking's claim that the GMA imposes a "bright-line" minimum of four dwellings per acre is erroneous. In making this claim, Viking relies upon a 1995 decision of the CPSGMHB. *See Bremerton v. Kitsap County,* CPSGMHB No. 95-3-0039, 1995 WL 903165, 1995 GMHB LEXIS 384, \*101 (Oct. 6, 1995). However, the growth management hearings boards do not have authority to make "public policy" even within the limited scope of their jurisdictions, let alone to make *statewide* public policy. The hearings boards are quasi-judicial agencies that serve a limited role under the GMA, with their powers restricted to a review of those matters specifically delegated by statute. *See* RCW 36.70A.210(6), .280(1); *Sedlacek v. Hillis,* 145 Wn.2d 379, 385-86, 36 P.3d 1014 (2001) (stating that public policy is set forth in constitutional, statutory, and regulatory provisions, as well as prior judicial decisions). *Accord Roberts v. Dudley,* 140 Wn.2d 58, 63, 993 P.2d 901 (2000); *Thompson v. St. Regis Paper Co.,* 102 Wn.2d 219, 232, 685 P.2d 1081 (1984). *See also Skagit Surveyors & Eng'rs, L.L.C. v. Friends of Skagit County,* 135 Wn.2d 542, 565, 958 P.2d 962 (1998) (stating that the GMA is not to be construed to confer upon a hearings board powers not expressly granted in the GMA).

¶41 Second, Viking's argument fails to account for the fact that the GMA creates a general "framework" to guide local jurisdictions instead of "bright-line" rules. *See* RCW 36.70A.3201; Richard L. Settle, *Washington's Growth Man-*

*agement Revolution Goes to Court*, 23 SEATTLE U. L. REV. 5, 9 (1999) ("most GMA requirements are conceptual, not definitive, and often ambiguous"). Indeed, the existence of restrictive covenants that predate the enactment of the GMA and limit density within the urban growth areas are the type of "local circumstances" accommodated by the GMA's grant of a "broad range of discretion" for local planning. *See* RCW 36.70A.3201; *Cent. Puget Sound Hearings Bd.*, 142 Wn.2d at 561.

¶42 Third, although the City's zoning regulations call for a minimum density of four dwelling units per acre, nothing in the regulations compels property owners to develop their parcels to any particular minimum density. Indeed, assuming without deciding that the Homeowners' and Viking's lots constitute nonconformities under the zoning regulations, the regulations provide that they may be maintained indefinitely. *See* SMC 20.10.040(B), SMC 20.30.280. Moreover, the City has correctly conceded that it "has no authority" to enforce or invalidate restrictive covenants, CP at 201, and explicitly accounted for the existence of such covenants in its comprehensive plan by forecasting that areas subject to covenants would experience less future growth than other areas within the City. Finally, the City's planning manager, on advice of the city attorney, determined that the covenant was not in irremediable conflict with city policy, and that the City "would process building permits on a lot with area that exceeded the minimum densities under the code for the land use district as a nonconforming lot." CP at 310. Accordingly, the density limitation does not violate public policy.

### C. Substantive Due Process

■■ ■■ ¶43 Finally, Viking asserts that judicial enforcement of the covenant would violate its substantive due process rights. While the substantive due process claims asserted by Viking clearly have continued validity, *see Mission Springs, Inc. v. City of Spokane*, 134 Wn.2d 947, 962-65, 954 P.2d 250 (1998), Viking's substantive due process rights have not been violated in this case.

¶44 A governmental action meets the requirements of substantive due process under the state and federal constitutions if the action (1) serves a legitimate public purpose, (2) is reasonably necessary to the achievement of that purpose, and (3) is not unduly oppressive upon a particular individual. *See, e.g., Rivett v. City of Tacoma*, 123 Wn.2d 573, 581, 870 P.2d 299 (1994) (citing *Presbytery of Seattle v. King County*, 114 Wn.2d 320, 330-31, 787 P.2d 907 (1990)). Viking claims that enforcement of the covenant would be unduly oppressive because complying with the covenant would force Viking to violate the City's comprehensive plan and zoning regulations.[9] This argument lacks merit.[10]

¶45 Viking concedes that it currently is in compliance with both the City's regulations and the covenant. Br. of Resp't at 11. Perhaps more importantly, Viking does not claim that enforcement of the covenant will deny it reasonable use of its property. Moreover, if Viking does wish to redevelop its property, the City has indicated that it would process building permits for Viking's property that comply with the covenant. Accordingly, enforcement of the covenant here would not be unduly oppressive to Viking.

## IV. CONCLUSION

¶46 The unenforceable racial provisions are severable from the remainder of the covenant under the applicable rules of liberal construction, and the enforceable remainder imposes a density limitation of one dwelling per one-half acre. This density limitation does not so conflict with public policy so as to be void for that reason. Finally, because Viking can comply with both the covenant and the City's

---

[9] Viking also claims that enforcement of the covenant would serve no legitimate purpose. But, as was just noted, enforcement of the covenant would serve to protect private property rights and maintain open space within the city of Shoreline—both legitimate purposes under the GMA.

[10] For the sake of this opinion, we will assume without deciding that enforcement of the covenant would constitute state action. Under *Shelley v. Kraemer*, 334 U.S. 1, judicial enforcement of a restrictive covenant can constitute state action. It is not clear that *Shelley* extends to the present case, however. *See State v. Noah*, 103 Wn. App. 29, 48-49, 9 P.3d 858 (2000).

zoning regulations, enforcing the density limitation does not impair Viking's substantive due process rights. We reverse the judgment of the superior court and remand for further proceedings consistent with this opinion.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, BRIDGE, CHAMBERS, OWENS, and FAIRHURST, JJ., concur.

¶47 SANDERS, J. (concurring) — While I agree with the majority in most respects I find the discussion of the city's zoning regulations, which "call for a minimum density of four dwelling units per acre," somewhat troubling. Majority at 130. Indeed, if the zoning regulations actually required a minimum of four houses per acre, *see* Shoreline Municipal Code 20.50.020, then I cannot understand how this restrictive covenant, which limits construction on this parcel of nearly one-and-one-half acres to a single dwelling, would not facially violate that public policy.

¶48 So too am I not convinced the planning manager's affidavit about how she or her attorney would apply the municipal code is competent evidence. Rather this is a legal question to be determined by the language of the ordinance, if necessary aided by accepted norms of statutory construction.

¶49 Yet, this provision of the Shoreline Municipal Code appears somewhat problematic. Indeed the whole issue seems to revolve around a matrix referencing various "standards" to residential zone designations, e.g., R-4, R-6, etc. The line on the matrix relied upon by Viking references "min. density" under the standards column and "4 du/ac" under the R-4 and R-6 columns. I see no further explanation in the code enlightening the reader what this means or how it is to be applied in practice.

¶50 I take it to be the Viking position that this text must mean it should be able to develop the subject property with up to five or six residences, restrictive covenant notwithstanding. Yet Viking adds in its responsive brief:

> The City also properly recognizes that its minimum density requirements apply only when a property owner elects to develop its property. If owners of developed low-density properties, whether affected by covenants or not, make the voluntary choice not to develop, there is no occasion to require compliance with minimum density requirements.

Br. of Resp't Viking Properties, Inc. at 39. While I admit the foregoing sounds reasonable, it must also be acknowledged that it conflicts with a possibly more literalist approach that property owners by virtue of the zoning code are forced to fully develop their property to meet "minimum density" requirements—a scenario quite inconsistent with the restrictive covenant at issue here.

¶51 However I do believe there is another reasonable way to read the minimum density requirement, i.e., that it is hortative: or aspirational only. Were that not the case, I would think the city might be within its rights to refuse to issue permits for not less than five dwelling units on the subject property or find the property owner in violation of the land use code for not fully developing its property. But how that interpretation would advance the alleged public policy to maximize density is unclear since the owner might lack the resources or inclination to fully develop its property to the minimum density standard, choosing instead to build nothing at all. Indeed, if that were the intent of the city fathers, I would think that the consequences of under-development would be spelled out, and not just left to the imagination.

¶52 There is one other consideration which prompts my conclusion that the minimum density requirement is simply hortative. *Morin v. Johnson*, 49 Wn.2d 275, 279, 300 P.2d 569 (1956).[11] Here I would rely upon that rule of construction which provides that land use ordinances must

---

[11]
It must also be remembered that zoning ordinances are in derogation of the common-law right of an owner to use private property so as to realize its highest utility. Such ordinances must be strictly construed in favor of property owners and should not be extended by implication to cases not clearly within their scope and purpose.

*Morin*, 49 Wn.2d at 279.

be strictly construed in favor of the property owner. I do not believe a minimum, as opposed to maximum, density requirement in any way favors the property owner except very indirectly in the aberrational situation we have here, where Viking is attempting to invalidate a restrictive covenant. But even here other adjacent and nearby property owners have a like property interest to maintain the viability of the covenant as does Viking to void it. So, on balance, the construction which favors the property owner also favors the validity of the density covenant.

¶53 I therefore concur.