# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE LAKE TRUST, a revocable trust governed by the laws of Washington, | No. 83761-3-I |
| Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| SKAGIT COUNTY, a Washington municipal corporation including its PLANNING & DEVELOPMENT SERVICES, | |
| Defendant, | |
| RICHMOND JPJ ENTERPRISES INC., a Washington corporation, and NIELSEN BROTHERS, INC., a Washington corporation, | |
| Respondents. | |

MAXA, J.[1] – The Lake Trust appeals the trial court's rulings after a bench trial that (1) a subdivision plat's restrictive covenant that prohibited the use of lots for commercial business purposes did not apply to real estate holding company Richmond JPJ Enterprises, Inc.'s (JPJ) and logging company Nielsen Brothers, Inc.'s (NBI) use of a lot in the subdivision for their commercial logging operations, and (2) the restrictive covenant had been abandoned. The trial court stated that the term "commercial business" normally would apply to a logging operation. But the court concluded that the

---

[1] The Honorable Bradley Maxa is a judge on the Court of Appeals, Division Two, sitting in Division One pursuant to RCW 2.06.040 by order of the Associate Chief Justice.

historical context of the area when the subdivision was platted in the 1940s, specifically the fact that timber was actively being harvested and transported through the subdivision, showed that the covenant was not intended to apply to logging operations. The trial court also held that the abandonment defense applied because after the subdivision was platted, the area continued to be used for logging activities.

We reverse the trial court's decision and remand for the trial court to enter judgment in favor of the Lake Trust.

FACTS[2]

*Parties and Relevant Properties*

The Lake Trust owns two lots in division 3 of the Lake Cavanaugh Subdivision in Skagit County (Lake Trust property). Both of the lots are located on South Shore Drive. One of the lots abuts the shore of Lake Cavanaugh and is improved with a single family residence. The other lot is upland across South Shore Drive and is vacant. Robert McCullough is trustee of the Lake Trust. McCullough and his wife acquired the Lake Trust property in September 2004 and later transferred ownership to the Trust.

JPJ, West Side Logging, LLC and Timberline Logging, Inc. are real estate holding companies either affiliated with, run by, or owned by brothers Robert Nielsen and David Nielsen. NBI is a logging and contracting company that also is either affiliated with or owned by the Nielsen brothers. NBI contracts with JPJ, West Side and Timberline to harvest timber from their properties.

---

[2] The parties stipulated to many of the relevant facts, and the stipulation was adopted by the trial court in its findings of fact. Other facts come from unchallenged findings of fact.

In 2018, JPJ acquired a lot in division 3 of the Lake Cavanaugh Subdivision ("JPJ property"). The lot is located on South Shore Drive approximately 2,500 feet away from the JPJ Property. JPJ purchased the lot for the sole purpose of using it for an access road for NBI's logging operations on the timberlands.

Timberline and West Side own four parcels of land totaling approximately 276 acres abutting the Lake Cavanaugh Subdivision ("Timber property"). The zoning of the Timber property allows timber cultivation and harvest of forest products.

*Historical Background*

In the early 1940s, the English Lumber Company owned much of the land surrounding Lake Cavanaugh, including what is now the Timber property, the Lake Trust property, and the JPJ property. English Lumber harvested timber on the properties using a series of roads and rail lines to move equipment and to remove and transport timber.

In January 1945, English Lumber sold most of its timberlands around Lake Cavanaugh ("timberlands") to Puget Sound Pulp and Timber Company, including most of the Timber property. English Lumber retained the property it owned abutting Lake Cavanaugh ("Lake Cavanaugh lands").

In September 1945, English Lumber sold the Lake Cavanaugh lands to Leslie Eastman. The deed to Eastman stated that the deed was subject to an easement created under an agreement dated as of January 1, 1945 (1945 agreement) between the seller, English Lumber, and the purchaser, Puget Sound Pulp.[3] Under the 1945

---

[3] The original 1945 agreement was not independently recorded and the parties to this lawsuit have been unable to find a copy of the original agreement.

Agreement, Puget Sound Pulp was permitted reasonable rights of way over the Lake Cavanaugh lands for the purpose of logging its timber. These rights of way and Puget Sound Pulp's rights expired 10 years from the date of the agreement. The deed to Eastman also was subject to easements granted to the State Division of Forestry to construct and maintain roads for forest protection purposes and other agreements.

Between 1946 and 1948, Eastman, Eastman's estate, and other successors-in-interest (primarily Richard Shorett, trustee) subdivided the Lake Cavanaugh lands into the Lake Cavanaugh Subdivision. Lake Cavanaugh division 3 was recorded in July of 1948 and created approximately 244 lots.

The plat maps for divisions 2 and 3 of the Lake Cavanaugh Subdivision dedicated rights of ways for public travel including what would later become South Shore Drive. The plat map for division 3 also dedicated a right of way between lots 20 and 21 of Block 2. The face of the plat division 3 includes the following "Restriction": "No lots shall be used for commercial business or manufacturing purposes." Clerk's Papers (CP) at 449. The face of the plat also contains a "Title Certificate," which identifies easements that encumber the lots in division 3 granted to the State Division of Forestry and Puget Sound Pulp. CP at 449.

*Use of JPJ Property*

Tract A of division 3, together with tracts A, B, and C of division 2 and other property conveyed by English Lumber to Puget Sound Pulp in 1945, make up the whole of the Timber property. Westside and Timberline acquired the Timber property from Weyerhaeuser Company in 2018.

4

In July 2019, West Side, Timberline, and JPJ (as landowner) and NBI (as timber owner and operator) submitted a Forest Practice Application (FPA) to the Department of Natural Resources (DNR) for the harvest of timber on approximately 25 acres of the Timber property. The FPA proposed using the JPJ property for access to the Timber property. DNR approved the FPA in August 2019.[4] Under the FPA, logging operations could take place only from May 15 through September 30.

The FPA proposed three separate harvest areas: units 1, 2 and 3. Units 1, 2 and 3 are separated by streams and/or gullies. The FPA proposed two separate road systems to access the harvest areas from South Shore Drive because unit 1 cannot connect to units 2 and 3 without construction of a large and expensive bridge. Road A accesses unit 1 from South Shore Drive through the right of way between lots 20 and 21 as designated in the plat for division 3. Road B provides access to units 2 and 3 from South Shore Drive by connecting with Road C. Road B connects South Shore Drive to the Timber property by going through the JPJ Property.

After DNR approved the FPA, JPJ submitted a County Road Access Application to construct access from the JPJ property to South Shore Drive for Road B. The application identified the access as commercial. The County approved the application and required JPJ to construct the access to Commercial Class Road Approach standards.

The JPJ property was used for the transit of vehicles (including but not limited to logging trucks, bulldozers and logging equipment) to and from the Timber property to

---

[4] The Lake Cavanaugh Trust appealed the FPA. Robert McCullough is a board member of the Lake Cavanaugh Trust.

South Shore Drive. JPJ and NBI have used and continue to use the JPJ property to remove timber from Units 2 and 3. The removal of timber included the transport of logging equipment and road building machinery and equipment as well as the employees needed to remove approximately 900,000 board feet of timber from units 2 and 3 and to transport the timber to various mills in the region. Log trucks went through the JPJ property to haul timber out of the Timber property.

*Lawsuit and Trial*

In October 2019, the Lake Trust filed a lawsuit against JPJ and NBI that included a claim for breach of the commercial business restrictive covenant and requested declaratory judgment and injunctive relief. The Lake Trust alleged that JPJ's and NBI's use of the JPJ property for commercial access associated with commercial logging violated the restrictive covenant. In their answer, JPJ and NBI asserted affirmative defenses of abandonment of the covenant, equitable cancellation or modification of the covenant, and waiver. They also asserted counterclaims for a private way of necessity and implied easement.

The trial court presided over a two-day bench trial. The court entered a Memorandum and Order Following Trial. In addition to adopting the parties' stipulated facts, the court issued detailed findings of fact and conclusions of law.

*Findings of Fact*

The trial court found that the January 1, 1945 agreement allowed for Puget Sound Pulp to have an easement for purposes of transporting timber across the Lake Cavanaugh lands. And after the timberlands were conveyed to Puget Sound Pulp, Puget Sound Pulp used the timberlands to harvest timber. In the late 1940s and early

6

1950s, Puget Sound Pulp removed the railroads and converted those grades to trucking roads.

The trial court further found as follows:

> Because Leslie Eastman was aware of the January 1, 1945 Agreement, [Puget Sound Pulp's] logging operations in the timberlands, and [Puget Sound Pulp's] continued rights of way over what was to become Subdivision 3 when he created the subdivision. *It was his intention to exclude logging transit to and from the timberlands from the term "commercial business."*

CP at 544 (emphasis added).

Regarding Road B, the trial court found that Road B connects the Timber property to South Shore Drive via the JPJ property. The court found that Road B was in existence, either as a road or a railroad grade, before English Lumber's sales to Puget Sound Pulp and Eastman. The road was in use after conveyance of the timberlands to Puget Sound Pulp and into the 1950's, but there is no evidence that Road B remained in use on or after January 1, 1955.

Regarding the JPJ property, the trial court found that JPJ purchased the property solely to use it as an access road for NBI's logging on the timberlands. The court found, "JBJ [sic] and NBI's interests on the property are purely related to the commercial business of logging." CP at 543. JPJ/NBI's anticipated use of the JPJ property was to have logging and dump trucks pass through the lot for at least eight weeks each year over the course of three or four years. The logging trucks would be expected to cross the property up to 24 times a day while going to and from the timberlands. It takes a couple of minutes for trucks to cross the JPJ property. The timber harvest on the timberlands is expected to produce a gross amount of $4 million of timber.

7

The trial court found that the restrictions for division 3 include a prohibition on use "for commercial business or manufacturing purposes." CP at 545. The court specifically found that "JBJ [sic] and NBI's intended use of the JBJ [sic] Property is for commercial business." CP at 545.

Regarding JPJ/NBI's abandonment defense, the trial court discussed the uses of four properties in division 3 of the Lake Cavanaugh subdivision. In 2004, James and Amy Weppler were granted a permit for the purposes of harvesting merchantable timber, along with road construction, on their lot. The logging was not for purposes of clearing the lot for construction of a residence. The Weppler property was logged at some point between 2004 and 2008.

The Linert property also is in division 3, and the property's primary use is as a single family residence. The property owner, Brett Linert, has lived there for 25 years. Linert operates a handyman business in which he goes to other properties to do work on them. Linert has a small pickup truck for the business that he parks on his property. The Secretary of State's address for the business is Linert's property.

Another property within division 3 had a connection with Happy Valley Trucking, Inc. That property address was registered with the Secretary of State as the principal mailing address for the business and its registered agent. The lot also contained an occupied residence. The lot had several commercial vehicles parked on it, primarily dump trucks and a trailer, and piles of rocks that likely were gravel until the property changed hands shortly before trial. Happy Valley Trucking was actively running its operations from that address. Trucks for Happy Valley Trucking had been observed entering and exiting that property over the last several years.

8

At least one home within division 3 was rented as a VRBO vacation property. Nothing about the outward appearance of that building would suggest that it was anything other than a residence.

*Conclusions of Law*

The trial court denied the Lake Trust's breach of covenant claim and dismissed that claim. The court provided the following analysis:

> Here, [Puget Sound Pulp] was actively logging the timberlands at the time that phrase was added to the plat restrictions. The January 1, 1945 Agreement and evidence of multiple old railroad grades and truck roads leading into South Shore Drive indicate that the Lake Cavanaugh Lands and specifically Subdivision 3 would be used for access to the timberlands at least through 1954 and potentially longer depending on the use of the right of way or the easement contemplated in the January 1, 1945 Agreement.
>
> While the intention in subdividing the property was to create a more residential area around Lake Cavanaugh, Leslie Eastman clearly contemplated that logging operations would be a component of the area. Under the January 1, 1945 Agreement, logging operations were required to transit through Subdivision 3 for several more years after the subdivision was platted in 1948. *The term "commercial business" would normally apply to a logging operation, but it does not given the historical context of the area surrounding Lake Cavanaugh.* The intended use for Subdivision 3 at the time of its creation was for it to be a residential area around the lake that allowed access to the timberlands, where [Puget Sound Pulp] was actively harvesting timber and entitled to liberal rights of way through Subdivision 3 through the end of 1954.

CP at 548 (emphasis added).

The trial court also ruled that JPJ/NBI's abandonment affirmative defense applied.[5] The court stated,

> Here, there is substantial evidence that the timberlands continued to be logged after Subdivision 3 was platted and that areas such as Road B within the subdivision continued to be used into the 1950s for purposes of accessing the timberlands for logging. Even if the restrictive covenant was

---

[5] The trial court declined to address the additional affirmative defenses of equitable cancellation and waiver.

intended to exclude that type of use, it was immediately abandoned by then-owners of lots in Subdivision 3 who permitted such use.

CP at 549. The court did not mention the four uses of other lots discussed in the findings of fact.

Finally, the trial court denied JPJ/NBI's implied easement counterclaim. The court stated, "Given the express language of the January 1, 1945 Agreement, the court concludes that Road B was a temporary right of way and that an implied easement does not exist for this potential access road to the timberlands." CP at 550.

Lake Trust appeals the trial court's Memorandum and Order Following Trial.

ANALYSIS

A.    FAILURE TO PROPERLY ASSIGN ERROR

Initially, JPJ/NBI argue that all of the trial court's findings of fact are verities on appeal because Lake Trust did not specifically challenge any numbered findings of fact in its notice of appeal or assignments of error. In reply, Lake Trust argues that it sufficiently identified the issues for appeal. And in its reply brief, the Lake Trust also formally assigns error to the trial court's finding of fact 10 and the court's conclusion of law stating that the Lake Trust's predecessors in interest abandoned the restrictive covenants in the 1950s.

RAP 10.3(g) states, "A separate assignment of error for each finding of fact a party contends was improperly made must be included with reference to the finding by number. The appellate court will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto." The Lake Trust assigned error generally to the trial court's Memorandum and Order Following Trial and did not specifically reference finding of fact 10 or any other finding.

10

Unchallenged findings of fact are verities on appeal. *Real Carriage Door Co. ex rel. Rees v. Rees*, 17 Wn. App. 2d 449, 457, 486 P.3d 955, *review denied*, 198 Wn.2d 1025 (2021).

Based on RAP 10.3(g), we typically do not review a claimed error not included in an assignment of error. *See Phillips v. Greco*, 7 Wn. App. 2d 1, 9, 433 P.3d 509 (2018). Nevertheless, in the exercise of discretion we can address findings of fact not included in specific assignments of error where the nature of the challenge is apparent from the content of the opening brief. *Harris v. Urell*, 133 Wn. App. 130, 137–38, 135 P.3d 530 (2006).

Here, the Lake Trust did not comply with the requirements of RAP 10.3(g). However, the Lake Trust's brief clearly indicated that it was challenging finding of fact 10, that Eastman's intention was "to exclude logging transit to and from the timberlands from the term 'commercial business.' " CP at 544. And the Lake Trust's brief clearly challenged the trial court's conclusion that abandonment had occurred. The issues raised and grounds for appeal were clear enough that JPJ/NBI were able to discern them and address Lake Trust's arguments. Accordingly, we exercise our discretion and consider the Lake Trust's challenge to finding of fact 10 and the trial court's finding of abandonment.

B.   STANDARD OF REVIEW

We review a trial court's decision after a bench trial to determine whether the findings of fact are supported by substantial evidence and whether the conclusions of law are supported by the findings of fact. *Real Carriage Door*, 17 Wn. App. 2d at 457. Substantial evidence is the amount of evidence sufficient to convince a rational, fair-

minded person that a premise is true. *Id.* All evidence and reasonable inferences are viewed in the light most favorable to the prevailing party. *Id.* As noted above, findings of fact that are unchallenged are treated as verities on appeal. *Id.*

The trial court's application of facts to law and the conclusions of law are reviewed de novo. *Id.*

## C.   INTERPRETATION OF RESTRICTIVE COVENANT

The Lake Trust argues that the trial court erred in determining that JPJ/NBI's commercial logging activities did not violate the restrictive covenant prohibiting the use of lots in the Lake Cavanaugh subdivision for commercial business purposes. The Lake Trust claims that the trial court improperly used extrinsic evidence to interpret the term "commercial business" to exclude logging operations. JPJ/NBI argues that the trial court properly applied the context rule in interpreting the restrictive covenant to exclude logging operations. We agree with the Lake Trust.

### 1.   Legal Principles

Restrictive covenants are enforceable promises regarding the use of land. *Viking Props., Inc. v. Holm*, 155 Wn.2d 112, 119, 118 P.3d 322 (2005), abrogated on other grounds by *Yim v. City of Seattle*, 194 Wn.2d 682, 702, 704, 451 P.3d 694 (2019). The purpose of restrictive covenants is "to make residential subdivisions more attractive for residential purposes." *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 699, 974 P.2d 836 (1999). Covenants are enforceable by injunctive relief if a plaintiff shows (1) a clear legal or equitable right, and (2) a well-grounded fear of immediate invasion of that right. *Id.*

The interpretation of a restrictive covenant is a question of law, and we apply the rules of contract interpretation in determining the meaning of a covenant. *Wilkinson v.*

*Chiwawa Communities Ass'n*, 180 Wn.2d 241, 249, 327 P.3d 614 (2014). The primary objective in contract interpretation is determining the drafter's intent. *Id.* at 250. Although interpretation of a covenant is a question of law, the drafter's intent is a question of fact. *Id.* But questions of fact may be determined as a matter of law if reasonable minds could reach but one conclusion. *Id.*

"In determining the drafter's intent, we give covenant language its 'ordinary and common use' and will not construe a term in such a way 'so as to defeat its plain and obvious meaning.' " *Id.* (quoting *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 816, 854 P.2d 1072 (1993))*.* When examining the covenant language, we must "consider the instrument in its entirety." *Wilkinson*, 180 Wn.2d at 250.

In general, Washington courts follow the "objective manifestation theory" of contract interpretation, under which the focus is on the reasonable meaning of the contract language to determine the parties' intent. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005). But to assist in determining the meaning of contract language, including restrictive covenants, courts also apply the *Berg*[6] "context rule." *Hollis*, 137 Wn.2d at 693, 696. This rule "enables trial courts to look to the surrounding circumstances of the original parties to determine the meaning of specific words and terms used in the covenants." *Id.* at 696. The context rule allows consideration of extrinsic evidence, but certain extrinsic evidence is not admissible: (1) "[e]vidence of a party's unilateral or subjective intent as to the meaning of a contract word or term," (2) "[e]vidence that would show an intention independent of the

---

[6] *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990).

instrument," or (3) "[e]vidence that would vary, contradict or modify the written word." *Id.* at 695.

The court in *Wilkinson* emphasized the limited use of extrinsic evidence. 180 Wn.2d at 251-52. The court stated that extrinsic evidence can be used only " 'to illuminate what was written, not what was intended to be written.' " *Id.* at 251 (quoting *Hollis*, 137 Wn.2d at 697). Further, courts "do not consider extrinsic '[e]vidence that would vary, contradict or modify the written word' or 'show an intention independent of the instrument.' " *Wilkinson*, 180 Wn.2d at 251 (quoting *Hollis*, 137 Wn.2d at 695).

2.    Trial Court Findings and Conclusions

The trial court made unchallenged findings of fact that "JPJ purchased the JPJ property solely for purposes of using it as an access road for NBI's logging on the timberlands" and "JBJ [sic] and NBI's interests on the property are purely related to the *commercial business* of logging." CP at 543 (emphasis added). In addition, the trial court made an unchallenged finding of fact that "JBJ [sic] and NBI's intended use of the JPJ Property is for *commercial business*." CP at 545 (emphasis added). And the court noted in its conclusions of law that "[t]he term 'commercial business' would normally apply to a logging operation." CP at 548.

Nevertheless, the trial court relied on extrinsic evidence to make a finding of fact that "[i]t was [Eastman's] intention to exclude logging transit to and from the timberlands from the term " 'commercial business' ", and to conclude that the term " ' commercial business' " does not apply to logging operations "given the historical context of the area surrounding Lake Cavanaugh." CP at 548. The court focused on the fact that when the restrictive covenant was included in the plat for division 3 in 1948, Puget Sound Pulp

was actively harvesting timber in the timberlands and had a right of way to use division 3 for access to the timberlands until at least the end of 1954. As a result, the court found that Eastman "clearly contemplated that logging operations would be a component of the area." CP at 548.

The dispositive issue here is whether the trial court properly relied on extrinsic evidence to determine the meaning of "commercial business" in the restrictive covenant.

3.    Analysis

There is little question that the ordinary, common, plain, and obvious meaning of the term "commercial business" includes JPJ/NBI's logging activities. The trial court expressly found that JPJ and NBI used the JPJ property for "commercial business," and concluded that a logging operation "normally" would constitute a commercial business. CP at 548. JPJ/NBI suggest that the term "commercial business" is ambiguous, but the trial court's unchallenged findings refute that suggestion. The trial court confirmed that a logging operation is a commercial business.

As a result, the trial court necessarily was not using extrinsic evidence "to determine the meaning of specific words and terms used in the covenant[]," *Hollis*, 137 Wn.2d at 696, or to " 'to illuminate what was written.' " *Wilkinson*, 180 Wn.2d at 251 (quoting *Hollis*, 137 Wn.2d at 697). The trial court already had determined the meaning of the term "commercial business." Instead, the trial court used extrinsic evidence to conclude that even though a logging operation was a commercial business, Eastman intended to exclude logging operations from the scope of the restrictive covenant. But the covenant contained no such exclusion, and instead stated without qualification that use for commercial business purposes was prohibited.

The Supreme Court in *Wilkinson* was clear: courts "do not consider extrinsic '[e]vidence that would vary, contradict or modify the written word' or 'show an intention independent of the instrument.' " 180 Wn.2d at 251 (quoting *Hollis*, 137 Wn.2d at 695). But that is exactly what the trial court did here. The court essentially rewrote the covenant to state that use of lots for commercial business purposes was prohibited except for commercial logging operations.

JPJ/NBI argue that the restrictive covenant must be considered in its entirety, and they focus on the title certificate on the face of the plat. JPJ/NBI emphasize that the title certificate expressly references Puget Sound Pulp's timber access easement over division 3. They claim that the title certificate and the restrictive covenant are contradictory, requiring extrinsic evidence to resolve the contradiction.

However, the trial court did not make any findings of fact or conclusions of law regarding the title certificate. The court apparently did not find any tension between the title certificate and the restrictive covenant. Further, the title certificate does not contradict the restrictive covenant. The title certificate notes that Puget Sound Pulp had an access *easement* across division 3. The restrictive covenant states that no *lots* shall be used for commercial business purposes. Although the trial court found that Puget Sound Pulp used Road B on the JPJ property into the 1950s, there is no indication in the record that Puget Sound Pulp owned any lots in division 3 when the subdivision was platted as opposed to exercising its easement right to access timber.

We conclude that the trial court erred in using extrinsic evidence to vary the plain language of the restrictive covenant. Accordingly, we hold that the trial court erred in ruling that the restrictive covenant did not apply to JPJ/NBI's logging operations.

4. "Use" of Property

In the alternative, JPJ/NBI argue the trial court's order should be affirmed based on the theory that temporarily transporting logs over the JPJ property does not constitute a "use" for commercial business purposes. We disagree.

JPJ/NBI focus on the fact that their activity is temporary, not permanent. But the trial court found that JPJ/NBI's intended "use" of the land was for commercial business. And the covenant's prohibition on the use of the land for commercial business does not include any temporal qualification. Instead, the covenant imposes a blanket prohibition on the use of the land within the plat for commercial business. Under *Wilkinson*, a temporal exception or qualification cannot be grafted onto the plain language of the covenant. We reject JPJ/NBI's argument.

D.   AFFIRMATIVE DEFENSES

JPJ/NBI argue that we should affirm the trial court's decision based on three affirmative defenses: abandonment, cancellation/modification, and waiver.[7] We disagree.

1. Abandonment of Covenant

The Lake Trust argues that the trial court erred in concluding that the restrictive covenant was abandoned in the 1950s. JPJ/NBI argue that the trial court's abandonment ruling should be affirmed. We agree with the Lake Trust.

---

[7] The trial court ruled that abandonment had occurred, but declined to rule on cancellation/modification, and waiver. But we can affirm a trial court's decision based on any grounds supported by the record. *Hoover v. Warner*, 189 Wn. App. 509, 526, 358 P.3d 1174 (2015).

a. Legal Principles

Abandonment is an equitable defense that will preclude enforcement of a covenant. *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994). "The defense of abandonment requires evidence that prior covenant violations by other residents have so eroded the general plan as to make enforcement useless and inequitable." *Id.* at 342. Equity will not enforce a covenant if it "has been *habitually and substantially violated* so as to create an impression that it has been abandoned." *Id.* (emphasis added) (quoting *White v. Wilhelm*, 34 Wn. App. 763, 769, 665 P.2d 407 (1983)).

However, a few violations of covenants do not constitute abandonment. *Peckham v. Milroy*, 104 Wn. App. 887, 890, 17 P.3d 1256 (2001). "Violations must be material to the overall purpose of the covenant, and minor violations are insufficient to find abandonment." *Mountain Park Homeowners*, 125 Wn.2d at 342.

Whether a violated covenant has been abandoned generally is a question of fact. *Green v. Normandy Park Riviera Section Cmty. Club*, 137 Wn. App. 665, 697, 151 P.3d 1038 (2007). However, we can decide questions of fact as a matter of law if reasonable minds could not differ. *See Meyers v. Ferndale School Dist.*, 197 Wn.2d 281, 289, 481 P.3d 1084 (2021).

b. Trial Court Ruling

The trial court concluded that the Lake Trust's "predecessors in interest abandoned the restrictive covenants in the 1950s when Subdivision 3 experienced significant logging activity." CP at 549. The court found that "there is substantial evidence that the timberlands continued to be logged after Subdivision 3 was platted

and that areas such as Road B within the subdivision continued to be used into the 1950s for purposes of accessing the timberlands for logging." CP at 549. The court reasoned that even if the restrictive covenant was intended to exclude that type of use, "it was immediately abandoned by then-owners of lots in Subdivision 3 who permitted such use." CP at 549.

      c.    Analysis – 1950s Logging

It is undisputed that Puget Sound Pulp continued to use the Lake Cavanaugh subdivision property, including Road B on what is now the JPJ property, for its logging activities after the restrictive covenant was imposed in the division 3 plat. But there is no indication in the record that these activities violated the covenant.

Puget Sound Pulp had the contractual right to a right of way on the Lake Cavanaugh lands under the 1945 Agreement with English Lumber, which allowed the right of way for 10 years. Therefore, evidence of logging in and around division 3 is consistent with Puget Sound Pulp's preexisting rights. And division 3 owners could not enforce the covenant because of these contractual rights. Not coincidentally, the trial court found no evidence that Road B was used on or after January 1, 1955 – when the January 1945 agreement expired.

In addition, the trial court did not find and there is no evidence in the record that Puget Sound Pulp violated the restrictive covenant. Covenants run with the land, and burdens the owner of property subject to the covenant with a duty to comply with the restriction. *Kiona Park Estates v. Dehls*, 18 Wn. App. 2d 328, 336, 491 P.3d 247 (2021). Therefore, the covenant here necessarily applied only to owners of lots in division 3. But there is no evidence that Puget Sound Pulp or any other logging

company owned a lot within division 3 during the 1950s.[8] As a result, they were not subject to the covenant and could not have violated it.

There is no evidence that the restrictive covenant was " 'habitually and substantially violated' " in the 1950s. *Mountain Park*, 125 Wn.2d at 342 (quoting *White*, 34 Wn. App. at 769). Therefore, we conclude that the trial court erred in concluding that the restrictive covenant had been abandoned because of logging activity in the 1950s. We hold that as a matter of law, no such abandonment occurred.

### d. Analysis – Four Alleged Violations

The trial court did not find abandonment based on the four more recent alleged violations of the restrictive covenant by the Wepplers, Linert, Happy Valley Trucking, and the VRBO property. Nevertheless, JPJ/NBI argue that these violations are sufficient to affirm the trial court's finding of abandonment. We disagree.

Even if we find that substantial evidence supports those alleged violations, we conclude they are insufficient to support JPJ/NBI's defense of abandonment. The four alleged violations involve four separate properties in a 244 lot subdivision. There is no indication that these were habitual and substantial violations. And we cannot reasonably conclude that these alleged violations "so eroded the general plan as to make enforcement useless and inequitable." *Mountain Park*, 125 Wn.2d at 342.

We hold as a matter of law that the four alleged violations of the restrictive covenant cannot support the trial court's ruling that the defense of abandonment applied.

---

[8] Puget Sound Pulp purchased two "tracts" in division 3, but those tracts were not lots.

2. Cancellation/Modification of Covenant

JPJ/NBI argues that we should affirm the trial court's decision by applying the equitable doctrine of cancellation/modification to the restrictive covenant. We disagree.

Changed neighborhood conditions is an equitable defense to the enforcement of a restrictive covenant. *Mountain Park*, 125 Wn.2d at 341-42. A material change in the character of the neighborhood can modify or eliminate a restrictive covenant. *Peckham*, 104 Wn. App. at 893. Whether the neighborhood's character has changed is a question of fact. *Id.*

JPJ/NBI argue that the history of the Lake Cavanaugh area demonstrates that logging and forestry have constantly been around Lake Cavanaugh and division 3 from before its creation to the present. But no material change has occurred in the Lake Cavanaugh lands neighborhood. The character of the neighborhood has remained the same for decades. Therefore, we reject this argument as a matter of law.

3. Waiver of Covenant

JPJ/NBI argues that we should affirm the trial court's decision by concluding that the restrictive covenant has been waived. We disagree.

JPJ/NBI argue that the equitable doctrine of waiver is applicable because the Lake Trust took no action against past violations over the past 18 years of ownership. But waiver is not listed among the eight equitable defenses identified by the Supreme Court in *Mountain Park* that are available to preclude enforcement of a restrictive covenant. *See* 125 Wn.2d at 341-42. And JPJ/NBI provide no authority suggesting that waiver is a defense applicable to the enforcement of restrictive covenants. Therefore, we reject this argument as a matter of law.

CONCLUSION

We reverse the trial court's decision and remand for the trial court to enter judgment in favor of the Lake Trust.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Mxon, J.

WE CONCUR:

Díaz, J.                              Mann, J.