166 P.3d 748 (2007)
GOLD STAR RESORTS, INC. Respondent/Cross Appellant,
v.
FUTUREWISE, Appellant/Cross Respondent,
Western Washington Growth Management Hearings Board; Whatcom County, Respondents.
No. 58379-4-I.
Court of Appeals of Washington, Division 1.
August 27, 2007.
*750 Kenneth Lederman, Seattle, WA, Counsel for Appellant/ Cross Respondent.
Jack O. Swanson, John C. Belcher, Bellingham, WA, Counsel for Respondent/Cross Appellant.
ELLINGTON, J.
¶ 1 Land use planning under the Growth Management Act (GMA), chapter 36.70A, is a dynamic process. Counties and cities must periodically review their comprehensive plans to adjust for changes in population, critical area ordinances, and legislative amendments to the GMA. Whatcom County's review did not address GMA amendments governing limited areas of more intensive rural development. The Western *751 Washington Growth Management Hearings Board properly remanded for such an analysis.

I. BACKGROUND
¶ 2 In 1997, Whatcom County adopted a comprehensive land use plan and associated regulations, which included a zoning device allowing limited areas of more intensive rural development (LAMIRD). Two months later, the legislature enacted strict new criteria for these devices.
¶ 3 The GMA requires counties to review and revise their comprehensive plans every seven years to ensure continued compliance with the act.[1] Whatcom County completed its review in January 2005, and found that its LAMIRD areas "`have not experienced significant change, nor has additional information been obtained regarding such areas since the adoption of the 1997 Whatcom County Comprehensive Plan that warrant further review and update of the Comprehensive Plan.'"[2] The county made no revisions to its LAMIRD criteria or to the mapped boundaries of the areas.
¶ 4 Futurewise, an advocacy group for responsible growth management, sought review by the Western Washington Growth Management Hearings Board (Board), contending that in its periodic review, the county should have revised its rural density designations to comply with the new LAMIRD criteria. Futurewise pointed out that Whatcom County's plan, WCO 2004-017,[3] allows rural densities now impermissible under the statute. Futurewise also challenged the county's adoption of a map depicting LAMIRD boundaries.
¶ 5 The county moved to dismiss, arguing that the new criteria do not affect an existing comprehensive plan. The Board rejected this argument, adhering to its view expressed in an earlier decision involving Whatcom County and Futurewise[4] that a LAMIRD is an optional planning tool which, if used, must comply with the GMA as amended:
The County's designation and regulation of limited areas of more intensive rural development must accord with the criteria in RCW 36.70A.070(5)(d). While those criteria were not in effect at the time that the County's comprehensive plan was first adopted, the update requirement applies to incorporate any GMA amendments into the review and revision of comprehensive plans and development regulations under RCW 36.70A.130.[5]
¶ 6 After this ruling, Gold Star Resorts, Inc. was granted intervenor status before the Board. Gold Star owns approximately 76 acres of land on the east side of the Interstate 5-Lynden Road interchange in Birch Bay, near the Canadian border. The entire property is currently designated as a "transportation corridor," one of the rural designations attacked in Futurewise's petition. Gold Star was permitted to intervene on condition that it abide by "the terms and conditions of all orders issued in this case."[6] In its prehearing brief to the Board, Gold Star formally *752 adopted all of the county's briefing and arguments.
¶ 7 After a hearing, the Board ruled that the county's LAMIRD designation criteria do not comply with the GMA. The Board remanded to the county for further review of its comprehensive plan.
¶ 8 Gold Star, but not the county, appealed to superior court.[7] The superior court reversed the majority of the Board's rulings, holding that the review statute does not require that comprehensive plans be amended to comply with current GMA requirements, and also holding that the rural density issue had been decided by previous litigation in this court. The superior court also ruled that the Board exceeded its authority or erroneously applied the law by adopting a "bright line rule" in its analysis of the rural zoning challenge.
¶ 9 Futurewise appeals.

II. STANDARD OF REVIEW
¶ 10 The appropriate standard of review, as summarized in the recent Supreme Court opinion in Lewis County v. Western Washington Growth Management Hearings Board,[8] is as follows:
The Growth Management Hearings Board is charged with adjudicating GMA compliance and invalidating noncompliant plans and development regulations. RCW 36.70A.280, .302. The Board "shall find compliance" unless it determines that a county action "is clearly erroneous in view of the entire record before the board and in light of the goals and requirements" of the GMA. RCW 36.70A.320(3). To find an action "clearly erroneous," the Board must have a "firm and definite conviction that a mistake has been committed." Dep't of Ecology v. Pub. Util. Dist. No. 1 of Jefferson County, 121 Wash.2d 179, 201, 849 P.2d 646 (1993). . . .
The legislature intends for the Board "to grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of" the GMA. RCW 36.70A.3201. But while the Board must defer to Lewis County's choices that are consistent with the GMA, the Board itself is entitled to deference in determining what the GMA requires. This court gives "substantial weight" to the Board's interpretation of the GMA. [King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 553, 14 P.3d 133 (2000).][[9]]
¶ 11 On appeal, we apply the standards of the Administrative Procedure Act (APA), chapter 34.05 RCW, "`directly to the record before the agency, sitting in the same position as the superior court.'"[10] Under the APA, "a court shall grant relief from an agency's adjudicative order if it fails to meet any of nine standards delineated in RCW 34.05.570(3)."[11] Here, Gold Star asserts that the Board's order is outside its authority under RCW 34.05.570(3)(b), that the Board erroneously interpreted the law (RCW 34.05.570(3)(d)), and that the Board's order is not supported by evidence that is substantial when viewed in light of the whole record (RCW 34.05.570(3)(e)).
¶ 12 We review errors of law de novo, giving "substantial weight" to the Board's interpretation of the statute it administers.[12] "`On mixed questions of law and fact, we determine the law independently, then apply it to the facts as found by the agency.'"[13] Substantial evidence is "`a sufficient quantity of evidence to persuade a *753 fair-minded person of the truth or correctness of the order.'"[14]

III. ANALYSIS
¶ 13 At the heart of this appeal are two questions: (1) whether the Board erred in ruling that the review statute requires the county to bring its comprehensive plan into compliance with current GMA requirements, and (2) whether the Board erroneously interpreted or misapplied the law in concluding that the rural density zoning criteria violate the GMA's density specifications.

A. Compliance with GMA Requirements

1. Res Judicata and Collateral Estoppel
¶ 14 As a threshold matter, Gold Star alleges that this challenge is barred under principles of either collateral estoppel[15] or res judicata[16] by our decision in Wells v. Western Washington Growth Management Hearings Board,[17] in which, according to Gold Star, we upheld the county's designation of Whatcom County's transportation corridors. Gold Star misreads Wells. Our decision was entirely procedural, addressing issues of the burden of persuasion, standing, and service. We remanded to the Board with directions to apply certain procedures in reviewing substantive challenges to the Whatcom County comprehensive plan. We explicitly refrained from reviewing "the substantive portions" of the Board's decision.[18]
¶ 15 In any case, the law has changed, the subject matter is related but not identical, and the issues are not the same. The challenge here is to the inadequacy of the county's comprehensive plan review, not to the validity of the original designations.
¶ 16 The trial court erred in ruling that Wells was dispositive. Neither collateral estoppel nor res judicata bars our review.

2. The Scope of the Periodic Review
¶ 17 Planning under the GMA is not static,[19] and comprehensive plans and development regulations must be reviewed and updated as necessary to maintain compliance with the GMA:
(1)(a) Each comprehensive land use plan and development regulations shall be subject to continuing review and evaluation by the county or city that adopted them. A county or city shall take legislative action to review and, if needed, revise its comprehensive land use plan and development regulations to ensure the plan and regulations comply with the requirements of this chapter according to the time periods specified in subsection (4) of this section. . . . The review and evaluation required by this subsection shall include, but is not limited to, consideration of critical area ordinances *754 and, if planning under RCW 36.70A.040, an analysis of the population allocated to a city or county from the most recent ten-year population forecast by the office of financial management.
(b) Any amendment or revision to a comprehensive land use plan shall conform to this chapter.[[20]]
Each county must complete a review every seven years.[21]
¶ 18 Central to this case is the scope intended by the legislature for the periodic review. Futurewise contends that under RCW 36.70A.130(1), the county must review its comprehensive plan and regulations for compliance with current GMA requirements, and that its failure to revise its designation of LAMIRDs and rural densities violates the review statute and leaves the county out of compliance with the GMA. Gold Star takes the position that the scope of the required review is limited to two subjects: critical areas ordinances and, if applicable, population allocation.
¶ 19 The Board agreed with Futurewise. In its preliminary order, which was incorporated into its final decision and order, the Board ruled:
The County's designation and regulation of limited areas of more intensive rural development must accord with the criteria in RCW 36.70A.070(5)(d). While those criteria were not in effect at the time that the County's comprehensive plan was first adopted, the update requirement applies to incorporate any GMA amendments into the review and revision of comprehensive plans and development regulations under RCW 36.70A.130.[[22]]
The superior court agreed with Gold Star:
RCW 36.70A.130(1) does not require counties to start from scratch and justify everything in their comprehensive plans and development regulations every seven years. Rather, the statute requires that counties review and evaluate their comprehensive plans and development regulations "identifying the revisions made, or that a revision was not needed and the reasons therefore." This statute gives counties considerable discretion to balance the need for finality in land use management with the need to ensure compliance with the purposes and goals of the Growth Management Act (RCW 36.70A).[[23]]
Our first task is to resolve this dispute over the scope of the review required by the GMA. Statutory interpretation is a legal question. Our review is de novo.[24]
¶ 20 RCW 36.70A.130(1) requires counties and cities "to review and, if needed, revise" comprehensive land use plans and development regulations "to ensure the plan and regulations comply with the requirements of this chapter."[25] Not surprisingly, the statute also specifies that revisions or amendments to plans "shall conform" to the GMA. Gold Star concentrates only on this second requirement, and contends that only amendments to the plan need comply with current GMA requirements, not provisions left intact.
¶ 21 This reading of the statute is narrow and cramped, and ignores the legislature's explicit statement of the purpose of review: to ensure compliance with "the requirements of this chapter." Nothing in this language suggests, nor do we believe, that the legislature intended to allow plans to fall completely out of compliance with the GMA over time by means of simple inaction. That reading of the statute renders amendment of the GMA essentially futile, because all cities and counties now have plans in place. We agree with the Board that the review statute requires *755 cities and counties to bring their plans into compliance with intervening legislative amendments.[26]
¶ 22 Gold Star expresses concern that a broad review requirement undermines the goal of finality in land use decisions. But Division Two of this court has already rejected the argument that "permitting the Board to review all plan provisions and regulations regardless of whether the County amended them would create an `open season' to challenge comprehensive plans and development regulations every seven years."[27] The court held that "by requiring review . . . every seven years, the legislature has determined that, in managing growth, the benefits to the public of keeping abreast of changes in the law outweigh the benefits of finality to landowners."[28]
¶ 23 We agree. The review requirement provides the vehicle for bringing plans into compliance with recently enacted GMA requirements and for recognizing changes in land usage or population. It creates no "open season" for challenges previously decided or time-barred. Nor does it undermine finality in land use decisions. "Finality" is a hollow concept here, because zoning may be changed independent of the review process, and changes in the GMA or zoning regulations cannot affect vested rights.[29] This does not mean, as Futurewise argues, that the county must revisit every aspect of its plan, only those which are affected by intervening legislative revisions.
¶ 24 We hold that the review statute requires Whatcom County to amend its comprehensive plan as necessary to comply with GMA amendments that came after adoption of the plan. The Board's remand for review for statutory compliance was proper.

3. Substantial Evidence Supporting the Board's Findings
¶ 25 County planning in rural zones must "protect the rural character of the area," and reduce "the inappropriate conversion of undeveloped land into sprawling, low-density development in the rural area."[30] Plans may, however, with some restrictions, provide for LAMIRDs if certain criteria are satisfied.[31]
¶ 26 In general, LAMIRDs allow continuation of greater densities than are usually permitted in rural areas, such as commercial areas at crossroads, recreational areas, and transportation corridors. LAMIRDs must be mapped and restricted to their existing use, so as to "minimize and contain" more intensive development:
(iv) A county shall adopt measures to minimize and contain the existing areas or uses of more intensive rural development, as appropriate, authorized under this subsection. Lands included in such existing areas or uses shall not extend beyond the logical outer boundary of the existing area or use, thereby allowing a new pattern of low-density sprawl. Existing areas are those that are clearly identifiable and contained and where there is a logical boundary delineated predominately by the built environment, but that may also include undeveloped lands if limited as provided in this subsection. The county shall establish the logical outer boundary of an area of more intensive rural development. In establishing the logical outer boundary the county shall address (A) the need to preserve the character of existing natural neighborhoods and communities, (B) physical boundaries such as bodies of water, streets and highways, and land forms and contours, (C) the prevention of abnormally irregular boundaries, and (D) the ability to provide public facilities and public services *756 in a manner that does not permit low-density sprawl;
(v) For purposes of (d) of this subsection, an existing area or existing use is one that was in existence:

(A) On July 1, 1990, in a county that was initially required to plan under all of the provisions of this chapter.[[32]]
In sum, LAMIRDs are not tools for encouraging development or creating opportunities for growth, and their densities must be confined to the clearly identifiable area of more intense development existing as of July 1990.
¶ 27 These criteria were added to the GMA two months after Whatcom County adopted its comprehensive plan in 1997.[33] Whatcom County conceded before the Board that its terminology does not "mirror state law,"[34] and that although it was aware of the pending legislative amendments, it did not consider these criteria in defining its designations for developed rural areas and did not attempt to analyze the logical outer boundaries of LAMIRD areas under RCW 36.70A.070(5)(d). The county conceded that some of its LAMIRD boundaries include "vast amounts of undeveloped land"[35] and further acknowledged that several LAMIRDs (including Emerald Lake) were to be reviewed for compliance with the LAMIRD standards later that year.[36]
¶ 28 Futurewise introduced aerial photographs showing swaths of apparently undeveloped land within the LAMIRD boundaries.[37] One such example is the Emerald Lake suburban enclave. An aerial photograph of the Emerald Lake LAMIRD, dated 2004, depicts dense residential development surrounding the majority of the lake shore. Approximately 800 feet south of the lake and 600 feet south of the developed area, a one mile by one-half mile expanse of what appears to be untouched forest land is included within the LAMIRD boundary.[38] The photograph strikingly illustrates that LAMIRD boundaries are not restricted to areas already developed as of 1990, do not "minimize and contain" the areas of intensive development, and seemingly take little account of physical boundaries.[39]
¶ 29 In short, the county's presentation to the Board confirmed that the county did not apply RCW 36.70A.070(5)(d) in drawing the boundaries for the LAMIRDs and that its process resulted in LAMIRD boundaries the statute does not allow. County action is entitled to a presumption of validity, but here the county admitted that its criteria did not match the statute nor produce compliant results. This alone is evidence sufficient to support the Board's remand for review of the LAMIRDs.
¶ 30 Additionally, the Board was plainly correct in finding the county provisions noncompliant.[40] First, none limits the LAMIRD *757 areas to development existing as of July 1990.[41] Three provisions (including the one Gold Star seeks to preserve) specifically anticipate future development:
Policy 2GG-2 [Identifying five towns as "small towns" with commercial centers catering to local residents and tourists]: Designate approximate town boundaries based on the areas characterized by existing development and logical extensions of the present service areas.[[42]]
Resort and Recreational Subdivisions  Rural  Purpose: Recognize the existing mixture of recreational and residential subdivisions and ensure that future growth can be serviced appropriately.[[43]]
Transportation Corridors  Rural  Purpose: This designation is designed to alert the community to proposed transportation corridor related expansion and to guide developments appropriately. Definition:
Transportation Corridors are areas in demand for transportation related services and improvements where planning is underway or anticipated.[[44]]
Two other provisions do not exclude development built or vested after 1990:
Small Towns  Rural  Locational Criteria: Existing small community or resort centers with adequate services, including water and sewer which can be cost-effectively provided; near existing transportation routes; characterized by commercial uses and higher densities than surrounding rural areas.
Suburban Enclaves  Rural  Purpose: To ensure efficient land use by allowing in-fill at suburban densities in areas already characterized by such development.[[45]]
And one provision makes no reference at all to existing development, with or without a date restriction:
Crossroads Commercial  Rural  Locational Criteria: Central to rural populations; commercial areas should be located near arterial routes and fulfill a need for goods and services in that area.[[46]]
The absence of the pre-1990 date restriction renders the provisions facially inconsistent with the GMA. Policy 2GG-2's notion of an "approximate" boundary conflicts with the statutory requirement that the county "establish" logical outer boundaries beyond which development cannot encroach.[47]
¶ 31 The evidence amply supports the Board's conclusion that Whatcom County Policy 2GG-2 and its LAMIRD rural designation descriptors do not comply with the GMA. Remand for review under the amended statutory provisions was proper.

B. Rural Zoning Densities

1. Appealability
¶ 32 Judicial review of administrative decisions is governed by the Administrative Procedure Act (APA), chapter 34.05 RCW. Subject to certain exceptions not applicable here, the APA precludes appellate review of issues raised for the first time on appeal.[48] Futurewise contends that Gold Star's arguments relating to rural densities are precluded because Gold Star did not address this topic at the Board level.
¶ 33 But the issues were developed by the county's briefing and arguments, which were explicitly adopted by Gold Star, and no purpose would be served by barring substantive review simply because the county did not participate in the appeal.[49] Moreover, Futurewise, *758 as the petitioner in the case, raised the issue below and assisted in creation of a record sufficient for review.

2. Applicability of Bright Line Rules
¶ 34 The Board applied a definition of rural density adopted in other Growth Management Hearings Board cases, to wit, one dwelling unit per five acres:
While the GMA does not establish a maximum residential rural density, all three of the Boards have found that rural residential densities are no more intense than one dwelling unit per five acres.[[50]]
Applying this rule, the Board concluded that six Whatcom County zones do not comply with the GMA.[51] The superior court characterized this ruling as constituting an erroneous interpretation or application of law or an action outside the Board's statutory authority.
¶ 35 The arguments on this issue are founded upon the Supreme Court's opinion in Viking Properties, Inc. v. Holm,[52] decided after the Board hearing in this case. In Viking, a developer sought to invalidate a restrictive covenant limiting density to one house per one-half acre.[53] The developer argued that growth management hearings boards, under the authority given by the GMA, had adopted a "bright line" rule requiring a minimum of four units per acre in urban-zoned areas.[54]
¶ 36 The Court rejected this argument, both because the GMA is only a guideline for local planning, and because the boards lack authority to define policy through their rulings:
First, . . . the growth management hearings boards do not have authority to make "public policy" even within the limited scope of their jurisdictions, let alone to make statewide public policy. The hearings boards are quasi-judicial agencies that serve a limited role under the GMA, with their powers restricted to a review of those matters specifically delegated by statute. See RCW 36.70A.210(6), .280(1). . . . [T]he GMA creates a general "framework" to guide local jurisdictions instead of "bright line" rules. See RCW 36.70A.3201.[[55]]
Gold Star asserts that the Board here erroneously applied a "bright line" rule by defining rural densities as a maximum of one dwelling unit for every five acres.
¶ 37 Viking is obviously distinguishable, involving as it does an effort to use Board rulings to invalidate a private covenant, but Gold Star's point is well taken. In the absence of legislative guidance, the boards are left to adopt some consistent approach. But guidelines are one thing and bright line rules another.
¶ 38 We do not, however, agree that the Board acted outside its authority, because Whatcom County explicitly embraced the one dwelling unit per five acre standard in its briefing,[56] and confirmed this position at the hearing: "As far as the underlying zoning, the county does concede that outside of properly established LAMIRDs, the zoning must *759 be based on board cases, or a density of no more than one unit per five acres."[57]
¶ 39 The Board did not order any particular planning outcome or the application of any particular definition of rural density, but rather remanded to the county for further review. Upon that review, the principles of Viking should be considered.

3. GMA Compliance
¶ 40 Futurewise challenged six zoning densities as inconsistent with the GMA. The six zones apply to rural areas, and permit up to three dwelling units per acre. As described above, the county conceded that residential densities of greater than one dwelling unit per five acres are not considered rural. Further, the county conceded that rural densities exceeding one dwelling per five acres are allowed only within proper LAMIRDs, and that the continued validity of its rural zoning is thus dependent upon the validity of its LAMIRD boundaries. Because the Board correctly remanded for review of the LAMIRDs, we also affirm remand for review of the rural zoning densities consistent with GMA-compliant LAMIRD boundaries.

IV. CONCLUSION
¶ 41 We reverse the superior court, reinstate the Board's final decision and order, and remand to the Board for further proceedings consistent with this opinion.
WE CONCUR: DWYER, J. and AGID, J.
AGID, J. (concurring).
¶ 42 I concur in and have signed the majority opinion. I write separately to clarify a misconception that has crept into the case law concerning the Growth Management Hearings Boards' (Boards) adoption of a "bright line rule" governing urban and rural densities under the Growth Management Act (GMA), chapter 36.70A RCW. While the Central Puget Sound Board did use that unfortunate term in its Bremerton v. Kitsap County decision,[58] a cursory review of its decision establishes that it was really adopting a rebuttable presumption that certain proposed densities did not conform to the GMA's definitions of and criteria for urban and rural areas.
¶ 43 For example, in discussing urban densities, the Board reasoned:
At the low end of the range of permissible urban densities, it is difficult to draw a universally appropriate maximum urban lot size. Several sources in the literature and the experience of growth management in other states strongly suggest that anything less than seven dwelling units per acre is not supportive of transit objectives and anything less than four per acre is sprawl. As noted above, the Board holds that up to 2.5-acre lots are urban. However, rather than adopt a maximum urban lot size, the Board instead adopts as a general rule a "bright line" at four net dwelling units per acre. Any residential pattern at that density, or higher, is clearly compact urban development and satisfies the low end of the range required by the Act. Any larger urban lots will be subject to increased scrutiny by the Board to determine if the number, locations, configurations and rationale for such lot sizes complies with the goals and requirements of the Act, and the jurisdiction's ability to meet its obligations to accept any allocated share of county-wide population. Any new residential land use pattern within a UGA that is less dense is not a compact urban development pattern, constitutes urban sprawl, and is prohibited. There are exceptions to this general rule. For example, 1-or 2.5-acre lots may be appropriate in an urban setting in order to avoid excessive development pressures on or near environmentally sensitive areas. However, this circumstance can be expected to be infrequent within the UGA and must not constitute a pattern over large areas.[[59]]
¶ 44 Similarly, the Board's discussion of rural densities focused on the range of uses and "typical" ranges of lot sizes.

*760 In determining what residential uses are permitted in rural areas, it must first be remembered that growth is permitted in the rural area. RCW 36.70A.070(5), as amended by EHB 1305, permits "appropriate land uses that are compatible with the rural character of such lands and provide for a variety of rural densities and uses." The definition of "urban growth" enables one to distinguish between "growth" generally and "urban growth." Simply put, growth is urban growth if it:
Makes intensive use of the land . . . to such a degree as to be incompatible with the primary use of such land for the production of food, other agricultural products, or fiber, or the extraction of mineral resources.
If growth does not make such intensive use of the land, then it is not urban growth.
. . . .
The Puget Sound Regional Council's 1994 Rural Workshop opined that:
Rural lands primarily contain a mix of low-density residential development, agriculture, forests, open space and natural areas, as well as recreation uses. Counties, small towns, cities and activity areas provide limited public services to rural residents. Rural lands are integrally linked to and support resource lands. They buffer large resource areas and accommodate small-scale farming, forestry, and cottage industries as well as other natural-resource based activities. Vision 2020-1995 Update, at 27.
The Board holds that the above description of rural land accurately describes the intensity and character of new residential activity and development that the Act permits in rural areas (i.e., land outside the UGA, excluding resource lands). The Board held above that a predominant pattern of 1-and 2.5-acre lots within the urban area would also constitute sprawl. The Board now holds that such a development pattern within the rural area would also constitute sprawl. Continuation of sprawl in either area violates the Act (see RCW 36.70A.020(2)). In addition, the Act requires a variety of rural densities within the rural area (see RCW 36.70A.070(5)) which will typically require a range from ten-, to 20-, 40-and 80-acre lot sizes.
The Board is aware that there are many 1-and 2.5-acre parcels throughout the region. These can be shown on a current land use map and continue with whatever rights are guaranteed by state and local law, such as the vested rights doctrine and continued use under a legal nonconforming status. However, the county's future land use map and zoning regulations may not permit the future creation of such lot sizes. The Board now holds that, as a general rule, new 1- and 2.5-acre lots are prohibited as a residential development pattern in rural areas.[[60]]
¶ 45 While the Supreme Court in Viking Properties v. Holm rejected the Boards' authority to adopt a "`bright line' minimum [urban density] of four dwelling units per acre," it did not reject the approach the Boards have actually taken in evaluating proposed urban and rural densities in GMA plans.[61] Neither our decision today nor the Viking opinion is designed to undercut the Boards' authority to evaluate GMA plans under the guidelines established by the Act, judicial decisions interpreting the Act and the Boards' own decisions. Thus, characterizing four units to the acre as "clearly compact urban development [that] satisfies the low end of the range required by the Act"[62] is not impermissible "public policy" making under the GMA and Viking.[63] Similarly, the Boards may recognize that, in order to avoid sprawl as required by the Act, "as a general rule, new 1- and 2.5-acre lots are prohibited as a residential development pattern in rural areas."[64] Neither is a bright line rule. Rather, they are rebuttable presumptions that serve as guidelines for local jurisdictions *761 seeking to develop plans that comply with the urban and rural density requirements of the Act.[65]
¶ 46 On remand in this case, the Western Board is free to consider the range of densities and uses and the unique local conditions, as well as "general rules" the Boards have fashioned over the years, to evaluate Whatcom County's revised Plan.
NOTES
[1] RCW 36.70A.130(1)(a), (4).
[2] Clerk's Papers (CP) at 115 (quoting Whatcom County Ordinance (WCO) 2005-006).
[3] It is not clear from the record when these descriptors first became a part of the comprehensive plan. Colloquy at the Board hearing suggests that they were in the original version of the plan adopted in 1997. WCO 2004-017, adopted in 2004, was the most recent reaffirmation of the descriptors, with only minor amendments to the portions challenged here. WCO 2005-006, which constituted the county's completion of its seven year review, incorporated all the amendments made to the plan in the preceding years.
[4] 1000 Friends of Washington is the former name of Futurewise. In 1000 Friends of Washington and Pro-Whatcom v. Whatcom County, West. Wash. Growth Mgmt. Hearings Bd., No. 04-2-0010, 2004 GMHB LEXIS 66, *19 (Aug. 2, 2004), the Board ruled as follows:

It is true that the County need not allow for limited areas of more intensive rural development under this provision and so it is optional whether it does so. However, if the County decides to allow areas of more intensive rural development in the rural zone, those areas must conform to the GMA requirements for such limited areas of more intensive rural development in RCW 36.70A.070(5)(d).
[5] CP at 1757.
[6] CP at 1036.
[7] The county did not participate, nor is it a party here.
[8] 157 Wash.2d 488, 139 P.3d 1096 (2006).
[9] Id. at 497-98, 139 P.3d 1096.
[10] Id. at 497, 139 P.3d 1096 (quoting King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 142 Wash.2d 543, 553, 14 P.3d 133 (2000)).
[11] Id. at 498, 139 P.3d 1096.
[12] Id.; Quadrant Corp. v. Growth Mgmt. Hearings Bd., 154 Wash.2d 224, 233, 110 P.3d 1132 (2005); Manke Lumber Co. v. Diehl, 91 Wash. App. 793, 801, 959 P.2d 1173 (1998).
[13] Lewis County, 157 Wash.2d at 498, 139 P.3d 1096 (quoting Thurston County v. Cooper Point Ass'n, 148 Wash.2d 1, 8, 57 P.3d 1156 (2002)).
[14] City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 46, 959 P.2d 1091 (1998) (quoting Callecod v. State Patrol, 84 Wash.App. 663, 673, 929 P.2d 510 (1997)).
[15] "When a subsequent action is on a different claim, yet depends on issues which were determined in a prior action, the relitigation of those issues is barred by collateral estoppel." City of Arlington v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 138 Wash.App. 1, 25, 154 P.3d 936 (2007). "Collateral estoppel, or issue preclusion, requires `(1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied. In addition, the issue to be precluded must have been actually litigated and necessarily determined in the prior action.'" Id. (quoting Shoemaker v. City of Bremerton, 109 Wash.2d 504, 507-08, 745 P.2d 858 (1987)).
[16] Under the doctrine of res judicata, or claim preclusion, "a prior judgment will bar litigation of a subsequent claim if the prior judgment has `a concurrence of identity with [the] subsequent action in (1) subject matter, (2) cause of action, (3) persons and parties, and (4) the quality of the persons for or against whom the claim is made.'" In re Election Contest Filed by Coday, 156 Wash.2d 485, 500-01, 130 P.3d 809 (2006) (alteration in original) (quoting Loveridge v. Fred Meyer, Inc., 125 Wash.2d 759, 763, 887 P.2d 898 (1995)), cert. denied, ___ U.S. ___, 127 S.Ct. 444, 166 L.Ed.2d 309 (2006).
[17] 100 Wash.App. 657, 997 P.2d 405 (2000).
[18] Id. at 661, 997 P.2d 405.
[19] 1000 Friends of Washington v. McFarland, 159 Wash.2d 165, 169, 149 P.3d 616 (2006) ("Planning is not a one time thing.").
[20] Former RCW 36.70A.130(1) (LAWS OF 2002, ch. 320, § 1) (emphasis added).
[21] Former RCW 36.70A.130(4).
[22] CP at 1757. Neither the county nor Futurewise appealed the preliminary order. Gold Star's intervention seven weeks later was conditioned on its agreement to "abide by . . . the terms and conditions of all orders issued in this case." CP at 1036.
[23] CP at 115 (quoting statute).
[24] Quadrant, 154 Wash.2d at 233, 238-39, 110 P.3d 1132; Lewis County, 157 Wash.2d at 498, 139 P.3d 1096.
[25] (Emphasis added.)
[26] See 1000 Friends of Washington, 159 Wash.2d at 170, 149 P.3d 616 (seven year review properly included amendments to comply with substantive requirements added after plan initially adopted).
[27] Thurston County v. West. Wash. Growth Mgmt. Hearings Bd., 137 Wash.App. 781, 793, 154 P.3d 959 (2007).
[28] Id. at 794-95, 154 P.3d 959.
[29] See Quadrant, 154 Wash.2d at 240, 110 P.3d 1132 (citing Noble Manor v. Pierce County, 133 Wash.2d 269, 278, 943 P.2d 1378 (1997)).
[30] RCW 36.70A.070(5)(c).
[31] RCW 36.70A.070(5)(d).
[32] RCW 36.70A.070(5)(d)(iv), (v) (emphasis added).
[33] See LAWS OF 1997, ch. 429, §§ 7, 53 (effective July 27, 1997).
[34] CP at 1626.
[35] CP at 1628, 1675.
[36] The county also stated that it opted to review some LAMIRDs each year on a rolling basis, rather than during the seven year review, believing the seven year review requirement had a more limited scope. (The county lost this argument in preliminary motions before the Board, a ruling we affirm for reasons discussed in section III.A.2 of this opinion.)
[37] Gold Star points out that aerial photographs are subject to interpretation, and argues that because Futurewise presented no expert testimony, the photos are valueless. But the photographs are not the only evidence here. We need not decide whether aerial photographs, standing alone, could constitute proof that land is undeveloped.
[38] On the comprehensive plan's designation map, the forested area included in the higher density zone appears larger than in the photograph.
[39] RCW 36.70A.070(5)(d)(iv)(B), (v).
[40] The challenged provisions include one "policy" and several "land use designation descriptors." Both types of provisions are elements of the comprehensive plan aimed at implementing the county's identified planning goals. See CP at 854. The designation descriptors define zoning in areas delineated on the county's official planning map. The descriptors include a title, purpose, definition, and locational criteria for each type of LAMIRD.
[41] "Existing" includes vested projects. See Quadrant, 154 Wash.2d at 240, 110 P.3d 1132.
[42] CP at 877 (emphasis added).
[43] CP at 894 (emphasis added).
[44] CP at 895 (emphasis added).
[45] CP at 894.
[46] CP at 894.
[47] RCW 36.70A.070(5)(d)(iv).
[48] RCW 34.05.554(1).
[49] King County v. Wash. St. Boundary Rev. Bd., 122 Wash.2d 648, 668-69, 860 P.2d 1024 (1993) (purposes include "(1) discouraging the frequent and deliberate flouting of administrative processes; (2) protecting agency autonomy by allowing an agency the first opportunity to apply its expertise, exercise its discretion, and correct its errors; (3) aiding judicial review by promoting the development of facts during the administrative proceeding; and (4) promoting judicial economy by reducing duplication, and perhaps even obviating judicial involvement.") (quoting Fertilizer Inst. v. United States Envtl. Protec. Agency, 935 F.2d 1303, 1312-13 (D.C.Cir.1991)); see also Thurston County v. West. Wash. Growth Mgmt. Hearings Bd., 137 Wash.App. 781, 807 n. 17, 154 P.3d 959 (2007) (county and intervenors permitted to raise issue on appeal where raised in county's briefing to Board).
[50] CP at 94.
[51] Residential zoning density is expressed as a ratio of dwelling units permitted per acre. The challenged designations include the RR1 zone (one dwelling unit per acre); RR2 zone (two dwelling units per acre); RR3 zone (three dwelling units per acre); Eliza Island (El) zone (three dwelling units per acre); R2A zone (one dwelling unit per two acres); RRI (one dwelling unit per three acres).
[52] 155 Wash.2d 112, 118 P.3d 322 (2005).
[53] Id. at 115, 118 P.3d 322.
[54] Id. at 128-29, 118 P.3d 322.
[55] Id. at 129, 118 P.3d 322. The Court enumerated additional reasons for its conclusion specific to the particular facts and not relevant here.
[56] CP at 1094. Gold Star adopted the county's briefing and arguments, and is at least arguably bound by the county's position, but we do not rely upon that analysis here.
[57] CP at 1633.
[58] 1995 WL 903165 (Oct. 6, 1995).
[59] Id. at *35 (emphasis and footnotes omitted).
[60] Id. at *35-36 (emphasis omitted) (alteration in original).
[61] 155 Wash.2d 112, 129-30, 118 P.3d 322 (2005).
[62] 1995 WL 903165 at *35.
[63] 155 Wash.2d at 129, 118 P.3d 322.
[64] 1995 WL 903165 at *36.
[65] Viking, 155 Wash.2d at 125-26, 118 P.3d 322.